Superintendent Johnson. Mr. Bailey. Morning. Morning, Your Honor. Anderson Bailey of Jones Day on behalf of Appellant Shultz. I'd like to reserve three minutes of my time for rebuttal, please. Fine. Thank you. May it please the Court. Myriad legal errors require vacating the judgment in this case. Before you start that, I couldn't figure out how many Muslims of the sect is the wrong word, but of that particular faith, are we talking about Pittsburgh Green and Dallas? I understand there was some reference of 15 to 40 at some point by Mr. Sharp, but I don't think that was credited by the District Court because it seems in reading the cases that the numbers do make a difference here and with respect to group worship. If you get, obviously, to all the weighing and other considerations, what does the record show, and who has the burden of showing what the numbers are? The record is primarily devoid of evidence on this point, Your Honor. As you mentioned, Mr. Sharp did testify that there were approximately 40 individuals with whom he submitted individual requests at SCI Pittsburgh. There was contrary evidence that there were only about 15 of those individual requests. The District Court did not resolve that question. Judge Haye found instead that there had been zero individual requests submitted, so we really didn't get clarification on the population. Well, that's a resolution, isn't it? I mean, she made a factual determination. Well, I don't think she made a factual finding as to the number of individuals at the prison who were there in this sect, and nor do I think was there ever any evidence at all with regard to SCI Green. Isn't that important for us to know? I think it's important for one particular issue, and that is qualified immunity. This is an affirmative defense on which, of course, the appellees bore the burden of fraud. Well, no, it's also important when we're talking about prison resources and so forth. I mean, it's very important as to whether an individual is entitled to, quote, group worship or not. But I think, with respect, Your Honor, we're getting a little ahead of ourselves, because the question really for this Court and for the lower court was whether or not the accommodation requests had been properly denied, and in particular, whether or not the defendants had met their burden in bringing forth evidence and argument to satisfy that first prong of the Turner analysis. The problem here is we were totally deprived of any analysis whatsoever by the particular burden that the troch were created, really out of whole cloth, in which she placed on Mr. Sharp the entire burden to disprove every conceivable penological interest. That was with respect to the first Turner prong, wasn't it? Correct, Your Honor. Because, in fact, it is Mr. Sharp's burden under the jurisprudence with respect to the overall burden of proof. This, where the magistrate judge may have misspoken, was really with respect to a burden of comment going forward with evidence as to the first Turner factor, right? I believe that's entirely correct, and I believe it's a critical point, because when you look at this Court's decisions in cases like Wolf and Jones v. Brown, if you can't get past that first step, then that case is positive. And the way Jones characterizes the Turner test is really as a two-part analysis, and the first step comprises only that first prong of Turner. Well, but isn't the penological interest here clear, as Judge Sirica's questions really suggested, because I don't think we were getting ahead of ourselves? The number of practicing Habashi members, who are members of, who are also Sunni Muslims, just as were the imams, both at Pittsburgh and at Green, is important here. I mean, the penological interest is implicated by the amount of prison resources that must be used, time, the space being made available, and money. I mean, that's clear, isn't it? I think irrespective of whether the magistrate misspoke, that penological interest is clear, isn't it? Well, certainly to the extent that providing an accommodation requires more resources than not providing an accommodation. As a general matter, sure, that is clear. There were other penological interests advanced at earlier stages of the trial with regard to the accommodation request at SCI Pittsburgh. So by no means does the fact that it logically makes sense mean that it is the actual reason why the accommodation was denied. And this is an important point, because I don't think that courts can come, particularly appellate courts, can come back after the fact and just hypothesize possible penological interests that may have been in play. Okay, aren't Protestants for purposes of offering religious services at these prisons all lumped together? I mean, they don't offer a Methodist and a Lutheran and a Presbyterian and a Baptist service all on the same Sunday, do they? I can't speak to that point, but I can say that there's evidence in the record that, for instance... I thought there was evidence in the record on that. There may be about Protestants. There's certainly separate Protestant and separate Catholic services, but there's also evidence in the record that there were separate Nation of Islam services at one point. All right, where does it stop? And let me ask you a question that has bothered me tremendously about this case the more time I spent with it. And that is a question that is in a way institutional and even goes not only to the role of prison administrators, but the role of this court. The SCIs, the prison system, sought the views of, did they not, the imams here? Also Sunni Muslims. Aren't we talking about a doctrinal dispute at most? And who's supposed to resolve that? Prison authorities? Article III judges? I think a doctrinal dispute is the reasons why the accommodation requests were denied in this case. And I think that's improper, and I think that's clearly established. Well, but what did the prison authorities do wrong in terms of examining that doctrinal dispute and attempting to resolve it? They should leave it alone. I mean, disagreement with what the tenets of a particular faith require. Well, they didn't on their own seek to intercede. It was brought to their attention by Mr. Sharpe's requests and complaints, right? That's correct in terms of the differences at stake. Where they erred was in denying the accommodation request based on their disagreement with those doctrinal matters. That is to say, they did not deny the accommodation request because it was too expensive, because there were security interests at stake. They did it because they didn't feel that he really needed to do what he said he needed to do. Well, the record is a little muddled on that, isn't it? Maybe you could help us straighten that out. At one point, it appears that the request is denied because they think Mr. Sharpe's an agitator, that he's trying to form his own, in effect, prison gang. It's really not religiously motivated. He's trying to set himself up as a leader and have some followers for reasons that are divorced from religion entirely. There's evidence in the record to that effect, and yet later it seems that the state walks away from that rationale. Can you shed some light on that? Well, I think Your Honor is largely correct. That testimony came with regard solely to SCI Pittsburgh, the first accommodation request. The circumstances are a little different because there was never a formal denial of the request. In the terms of there's typically a written response and a grievance process, and we really didn't see that happen at SCI Pittsburgh. For analytical purposes, then, Mr. Bailey, we should be taking it that his religious sincerity is not questioned? It has never been in dispute. It has never been in dispute in this case that these are sincerely held beliefs, that they're religious in nature. It was in dispute at one point, but for our purposes, we don't have to think about that dispute, right? I don't think so at all. Okay. Now, how is the burden of proof, how should it work? Judge Smith has aptly talked about a burden of going forward. I mean, who's got the first step? Mr. Sharpe is the claimant. Is it the position of your client that before he has to do anything, the government's got to come forward and start talking about its interests? Well, I think the very initial step is typically one can't attack whether or not a particular belief was sincerely held and religious in nature. And that's never been a dispute in this case, so it's really not been a part of our analysis. And it's up to the defendants to come forward with some sort of legitimate penological interest, so that both the plaintiff and, more importantly, the court can assess whether or not that rational connection exists. Well, it's not much of a burden, though, at that stage, is it? I mean, isn't it enough for the Commonwealth here, the prison system, to simply identify their reasons, and then that burden of going forward shifts to Mr. Sharpe, right, as part of his overall burden of persuasion, as to why those reasons are wrong, why they're weak, why they can't be supported? I think that's generally exactly right. I would say that there are, there could be instances. But otherwise, I mean, if the Commonwealth doesn't at least identify what they are, then Mr. Sharpe is shadowboxing. He doesn't know what to knock down. But again, it's a pretty low hurdle for the Commonwealth in the first instance. Most courts use the word minimal. I do think that there can be instances where evidence is required to meet that burden. And I believe the court has recognized that previously. And I think it's interesting to look at the trial court's decision in December 2004 on the summary judgment motion that the defendants filed as to the First Amendment complaint, because there's a textbook Turner analysis where they come forward with their reasons. And it pertains only to SCI Pittsburgh, I believe. But they come forward with their reasons citing, I believe, cost and security. And the district court does a full Turner analysis, assesses whether or not that rational connection exists, and found in that case that it didn't. Can I get you to turn to the RLUIPA claims here for a minute and ask you a couple questions? First, would you agree that injunctive relief is no longer an issue in this case because Mr. Sharpe has been moved to a new facility and his treatment at the other prisons is now irrelevant as pertaining to prospective relief? To be frank, Your Honor, I really don't take a position on that issue. I do believe that there are claims for injunctive relief in the Second Amendment complaint. I'm asking you to take a position on that issue as his lawyer. You've made a claim in a complaint, and I want to know, are you sticking by that, or is the fact that he's in a different prison, doesn't that mean that a claim for injunctive relief is moot at this point? I'm sticking by it because I think there are requests for injunctive relief that go to the DOC that are not facility-specific. Well, an injunctive relief for what? I mean, we have nothing here. Maybe you can help me out, but I'm not aware of any assertion that he's got a problem at Graterford. So what would our injunction be? We know you're not doing anything wrong, but don't do it again. I think Your Honor's point is well taken, and I'd be happy to take a look at the Second Amendment complaint and try to identify some of the ones that may still be outstanding. All right. So if we take it for sake of argument for a moment, that there's not going to be any injunction here because he's in a new prison and there's been no complaint about trouble for him at Graterford, then we're talking just about money damages on the RLIPA claim, right? And we can assume there are no official capacity claims. I think that's the safest assumption. I mean, we got some 28J letters from you folks, but I'd like you to explain to us why the reasoning of Sussman does not give us some persuasive insight about individual capacity claims, particularly in light of the fact that every circuit court to look at this so far has ruled against the position you're pressing on us. Right. I know my red light is on. Sussman is persuasive, and it's persuasive to suggest that individual capacity claims must exist under RLIPA. And the reason is precisely because this is spending clause legislation. And as such, under SABRI, Congress is entitled to attach conditions on the receipt of federal funds that allow to police against their misuse. May I interrupt you just at that stage based on something you just said? I assume that it is accurate to conclude that you have not at any point raised or suggested or certainly argued that RLIPA has been invoked, has been passed by Congress invoking its Commerce Clause powers. You haven't raised or argued that. In other cases, that may be more relevant, but not here. To speak for a moment about spending clause jurisprudence in general, what we see in the Supreme Court decisions is a reliance on contract law where a statute is unclear or ambiguous. And therefore, we can refer back to contract law to help us clarify some of these ambiguities. What we do not do where we have a clear statute is permit contract law to come in and muddy the waters and to create an ambiguity. Isn't the reason that the spending clause jurisprudence is the way it is is because the states need to know if they're buying into taking these funds or whatever they're going to be getting, that there's going to be this intrusion on the running of the state. So my question to you is, what do state officials care? What do the human beings who occupy those positions care? Whether you call them, say, I'm suing you with your official hat on or I'm suing you with your individual hat on. If you're suing them, you're suing them, and the interference and the problems created for the state are just as real, whatever label you hang on it. Doesn't the state have the very same interest in the sense of not having its programs interfered with, whether you choose to call it an individual claim or an official capacity claim? Well, the state has to accept a certain degree of interference. Why? I mean, Sussman says they don't. Sussman says without a clear delineation of what that burden's going to be, they don't have to accept it. With regard to this one particular issue, Sussman said that, but that was an 11th Amendment analysis. I mean, there's no doubt, for instance, that there can be lawsuits or injunctive relief under our LUPA. Well, my question to you, though, Mr. Bailey, is isn't the same thinking that informs the sovereign immunity analysis persuasive as to an individual capacity claim? Analytically, yes, they're different because the individuals are not the sovereign, but isn't the end to be achieved precisely the same, that is, not having state programs interfered with unless the state knows about it clearly in advance? No, I think that's a very good point, and I think that is the case. But we have to look at the language of the statute and whether or not it puts the state on clear notice that this is going to be an issue. And here the Supreme Court said it didn't, right? It didn't because the terms of appropriate relief did not clearly encompass monetary damages with sufficient clarity under 11th Amendment clauses, excuse me, 11th Amendment purposes. But the question is different as a general spending clause matter. It's whether or not the terms of the statute, and in specific, how the word government is defined. Even under sobriety, don't you have to put folks on notice? Doesn't the statute need to let people know, and you're going to be sued? Absolutely, and it does exactly that when it says individuals acting under color of state law. There's really no question, I don't think, about what those words mean. I mean, those are some of the most famous words in civil rights litigation. I think even in Appellee's brief, they could see that Section 1983, everybody knows what this means. And so that's sufficiently clear notice, particularly when you consider the other terms that are used in that provision. But in borrowing that phrasing from Section 1983 and inserting it where it does, which is to say right after government officials, that is the clear notice that is sufficient for spending clause purposes. And once you get that, then Congress is certainly entitled to provide the means by which they can police the expenditures of federal money, so that if federal funds are being misused, there's some means to redress that, because we cannot have federal funds underwriting the violation of federal law. That's the necessary and proper clause. That's why Congress is entitled to create some mechanism, some means by which the use of federal funds is policed. And it's done that in our loop by providing a private right of action for individuals like Mr. Sharp. Otherwise, the misuse of federal funds goes unredressed, and particularly if injunctive relief is not going to be available in instances like this. Then you have federal funds being used to violate federal law with absolutely no remedy whatsoever, because there's not going to be any injunctive relief that will correct it on a going-forward basis, and there won't be any monetary damages available to redress the past violation. So that's why I think it's critical that there be an availability of monetary damages, and individual capacity claims under our loop. Going back to the accommodation issue, again, what's in the record about the number of Habashi Muslims, and were findings made, and who had the burden of proving that? Because as I understand it, yours is, it's not that Mr. Sharp was denied his individual right to practice his religion, but he wanted to do so on a group basis. I'm sorry, Your Honor, I didn't hear that last part. Your claim, as I understand it, is that he wants to be able to worship on a group basis, not as an individual, which he's been permitted to do. That was among his requests. There were others. Well, that's, no, no. That's the primary basis for his request. Yeah, isn't that? Yes. Well, who has the burden of proving the numbers? I think when you start to talk about specific numbers, that is, and a right to communal worship, that is an issue pertaining to the qualified immunity analysis, because I don't think that you can... It has to apply, it has to apply to the Turner analysis, doesn't it? How can it be the case? I mean, it's true that, you know, from a biblical perspective, wherever two or three of you are gathered in my name, that's good enough, but for people running a prison, it would be... Wouldn't it be kind of absurd to say, if there's any two people here, you go hire a chaplain and make sure there are facilities available for those people? That could become overwhelmingly burdensome in a heartbeat. I mean, doesn't it have to be something that's addressed in the context of Turner? To the extent it does, Your Honor, that is the defendant's burden. To come forth and say, hey, listen, we just can't do this. It just doesn't make practical sense. But before the defendant comes forward and says that, you know, Judge Siric is asking something that I'm really interested in, too. Doesn't the plaintiff have to come forward and say, I've got a lot, here are how many people I've got? At Pittsburgh, at Dallas, and at Green. This is a real group, real numbers, really interested. It warrants the resources of the state to let us engage in communal worship. Doesn't he have to do something to prove that before the state gets into it? I don't think so. I mean, he makes that request. And to the extent he does have to say something, there is the evidence in the record, at the very least, of multiple individuals at SCI Pittsburgh. How can the state ever make a resource-based determination, one way or the other, if they don't know the number of the flock? How do they do that? It may be difficult. But the problem is they never came forward and said any of this. They never asked the questions that this Court is asking. And they never suggested it. That's why the burden of proof is an important issue in a case like this. It absolutely is. And it is on the defendants at this first problem. Not the burden of proof. The overall burden of proof is clear under the cases, and that is with your client, Mr. Sharp. There may be a burden, there is a burden, of going forward with something as to the first Turner prong. That's the real question I think that's being pushed on you again and again, which is the defendant does, under Turner, have a responsibility to come forward with a statement of a penological interest. We're going to get into this with your learned colleague here about whether Overton really sub silencio overrules that line of cases. But assuming for the sake of our discussion right now, it doesn't, the question that's being put to you is, before the government's got to come forward and do something like that, in a communal worship claim like the one you've got, doesn't the proponent, that is the claimant, have some responsibility to come forward and say, I have a community that wants to worship, and it's demonstrable. Here's what I got. If he uses the word we in his accommodation request. That's enough? I think that's enough. So he could just say, me and my imaginary friend. He's got, it's just the operative pronoun is we. Me and one other person? Frankly, Your Honor, I think that if there's a claim that I cannot worship with the existing services, and I would like a separate imam to come in to have a group of one worship session. So it's not even two, it's one. It could be one. Your position is every individual inmate who wants a separate cleric and a separate opportunity, room, space, et cetera, to worship is entitled to that. Absolutely not. You don't want us to take that as your argument. I certainly don't, and that is absolutely not my permission with respect, Your Honor, because all I'm saying is that once you make that request, you've made a legitimate accommodation request. So far as you have this sincerely held belief, it's religious in nature, and you've made that accommodation request, that's enough to impose on the defendant some responsibility in addressing that request, in granting or denying it, for some reason that is not simple disbelief in what the tenets of your faith require. Any other questions? They're free to deny it, and they're free to constitutionally deny it if they do it for the proper reasons. And so perhaps in a group of one worship situation, there is an imposition of cost and burdens, et cetera, but we don't know that in this case because they never came forward and said that. That's the problem. As Judge Smith said, plenty of shadow boxing here, and the real danger we get into is not just this incredibly difficult burden that Mr. Sharp has to meet for the litigation of his fundamental First Amendment rights, but imposing this extensive burden on him, we are opening up prison administrators to unrestrained discovery here because so long as it is his burden... Good. I think we understand your point. You're coming back on rebuttal? Yes. Thank you. Thank you. Good morning. May it please the Court. Kamal Alexander-Maritchely from the Office of the Attorney General of Pennsylvania for the Appellate. Good morning. Good morning. I would like to begin with a simple statement of our position in this case as regards the burden of proof on the First Turner Prompt. I think that problem in this particular case, in light of the record and in light of the magistrate judge's findings and conclusions, is more apparent than real. May I ask you, however, if you would agree that the magistrate judge erred in saying we read the Supreme Court's holding in Overton to sub silentio overrule our Court of Appeals' earlier line of cases that place a burden upon the defenders of prison rules to demonstrate that the New Jersey legislature might reasonably have thought the statute would advance the interest of... Candidly, I do not think she erred, and I devoted a great deal of my brief to discussing how, in fact, Overton v. Bezzetta returned to the wellspring of Jones v. the North Carolina Prisoners Union. Don't you think the Supreme Court, if it were going to overrule Turner and a whole string of cases relying on it, would have gone about that a little more directly than by inference, by implication? It depends on what you think Turner means. Turner's pretty clear what it means. Turner, by its terms, talks about the prison coming forward to show some valid penological interest. I mean, when it says demonstrate a valid penological interest, you really think that Turner was saying that the prisoner is supposed to figure out what the valid penological interest is? I think that what Turner was saying was, and in that case, Turner itself arose from a trial like this. So, in fact, as indeed was the case in Beard v. Banks, which arose from a motion for summary judgment, in certain circumstances it may be convenient forensically. It may be, in fact, necessary in view of the murk of the circumstances. Counsel, do you really think that the magistrate judge did not err when she wrote, Plaintiff has utterly failed to carry his burden to show otherwise. Given his burden to negative, every conceivable legitimate penological interest which might support S.C.I. Green's denial of the accommodation, he failed to carry his burden. You get that language from Turner? Is that a correct statement of law? Every conceivable legitimate penological interest. That is, in fact, the statement of the rational basis test that applies in situations where strict scrutiny does not apply. May I simply clarify the point? Was this a correct statement for purposes of analyzing this claim or not? Your Honor, I don't think it's necessary first for me to defend whether or not it was particularly a correct statement in this particular case. Everything flows from it. How can you not address that? Everything in this case flows from the magistrate judge's decision that Turner was no longer good law and it was on Mr. Sharp to do just what Judge Smith read to you, negative every conceivable... Then I make the position quite clearly that she was correct. But, and I've analyzed that in my brief, I've looked at it in some detail. I would simply want you to look at two other factors. One is... Let me ask this, and maybe you're getting this. Can you assume for discussion that we didn't think that's right? That we didn't think a sentence from Overton bore that kind of weight? Could you still win? Conceding in arguendo that she was wrong. I'd be happy to concede in arguendo before this panel that she was wrong. I believe that we win. And that's what I've been trying to argue in some detail. Because... I think you ought to proceed on the assumption that she was wrong on that. Very well, very well. I bow to the court's determination on that matter. I will, in fact, return to where I began, which in this particular case, we have a lengthy history of cases, including most recently a case by Judge Van Aske, who recently joined you on this bench in 2008 when he was on the Middle District bench. A long line of cases dealing with situations where an inmate demands an accommodation in the form of a separate congregation. And those cases in and of themselves discuss the existence of the legitimate penological purposes that are necessarily implicated every time that type of request for an accommodation is made. Counsel, I haven't... And I'm not going back to the Overton issue. I'm staying with... Assume that the magistrate judge was wrong. But we have, post-Overton, in Jones v. Brown, expressed that the ultimate burden of persuasion, the ultimate burden of persuasion with regard to the reasonableness of a regulation on the inmate is on the inmate. Correct, Your Honor. I mean, why aren't you arguing that? I was careful in my questions with your adversary to isolate a burden of going forward as to one Turner factor from the overall burden of persuasion, which seems to be clear here. The overall burden of persuasion is ultimately on the proponent. That is what all the cases teach, including Turner. And ultimately, it is the proponent's duty in order to succeed to prove that in some respect, what we did was an exaggerated response. That in light of legitimate penological purposes, in light of our need to handle our resources correctly, in light of the existence of a reasonable alternative at the minimum cost, this is simply a pretext on our part. That is how an inmate wins a case like this. And there is nothing in this record that demonstrates that that burden was met. What there is in this record, as well as the fact that cases of this nature, at this point, and this Court has in respect to our prohibition of UCC materials, used decisions in other cases to demonstrate the existence of a legitimate penological purpose independent of evidence. And that's exactly what we can do in this case. But we had evidence. We had Father Terza from SCI Pittsburgh. We had Father Monick from SCI Green. And we had Deputy Superintendent Krasevic from SCI Pittsburgh. Now what they said was, it is the DOC's general policy, in line with Judge Aldersert's opinion some 40 years ago in the Gittelmarker case, to minimize the proliferation of separate religious congregations. We do it with Protestants. We do it with Catholics who also... Once you're in that mindset, you are necessarily making judgments about doctrinal differences, right? Like, eh, you're really no different than a Methodist is from a Presbyterian. Not as different as a Catholic is from a Presbyterian. I mean, that's the analytical mode that the state puts these chaplains in, right? No, Your Honor, that's where Judge Sirica's inquiry comes in. We don't get into what they believe or the sincerity of their belief. We get into how many of them there are. If there is a substantial number of individuals who believe in a certain particular way, then there may, in fact, under the teachings of this bench, be a right, as it were, to a religious accommodation. Well, Mr. Sharpe, as a pro se advocate, seemed to do a pretty effective job in getting the imams to acknowledge that they thought he was a heretic and that it was their responsibility, the imams, to make sure everybody else in the prison knew that what he believed was heresy and contrary to pure and appropriate views of Sunni Islam. That had absolutely nothing to do with the fact that he didn't put his religious request on DC Form 52 at Pittsburgh, and when he did so at Green, he was the only individual who identified himself as a Habashi. Isn't there evidence in the record that Father Terz has said we don't use that form? There's... The record is very confused, but there's a finding of fact by the magistrate judge that he, in fact, procedurally defaulted at SCI Pittsburgh by not using the proper form. I think I'm entitled to rely on that finding of fact. In view of disputed evidence, this was a bench trial. The judge may have made a mistake in terms of how she looked at the Turner test. She may have, in fact, looked to the beginning, as you suggest, and looked at the end and put it at the beginning.  is, in fact, on the inmate. But this court recognizes its interpretation of Turner to be that there's an initial burden of production on the Department of Corrections to somehow satisfy the demonstration of the existence of a legitimate penological purpose. And what is that burden specifically? Is it sufficient to simply enumerate the reasons, state the reasons? Yes. And they have to be... At that point, the Department of Corrections takes the risk, getting back to what the inmate's ultimate burden is, of falling victim to a pretext analysis. I mean, if it's an exaggerated response, if it doesn't make sense, if it falls to an analysis of common sense or evidence, then, in fact, that's a risk they take. But all they have to do is to be able to stand on the circumstances. I even suggest that your jurisprudence, which, incidentally, is not without... Flaws? Yes, Your Honor, in the sense that there are... You could have paused before you answered my question, maybe a little bit. I was looking for inconsistencies, is what I'm trying to say, not flaws. Well, that's because... I would never say flaws. But Williams v. Morton and Newman v. Beard seemed to support the look at this that the magistrate judge took. Now, I'll be the first to say that wasn't a focal point of either of those disputes. What kind of evidence do you... And I was an attorney... What kind of evidence do the prison authorities have to put forward? That is, you can almost always, in every case, to say, look, this is burdensome, we lack resources, and sort of make a blanket statement. Do you have a burden to come up with a lot of specifics, really quite detailed evidence that... Assuming the magistrate erred in this case, Judge Sirica, I think that's where your jurisprudence has much to teach us in terms of how to look at this. It depends on the nature of the dispute. If the rational basis, like in Wolfe v. Ashcroft or Waterman v. Farmer, isn't apparent to common sense, I would suggest doesn't have a history of being evaluated, as separate congregations do, with an analysis of what the recurrent legitimate penological purposes are, or some other reason that would fit along those areas, then your jurisprudence teaches that under those circumstances, it's not simply enough to say we have a legitimate penological purpose, that you have to somehow introduce evidence that brings it all together. But how could we clarify our jurisprudence? Seriously, if you were writing the opinion, or if you were asking us specifically how to write the opinion, what should we say? Your Honor, I'm honored that you would ask me that. Well, I'm just being lazy. I want you to tell us. I would say that, in fact, in all candor, the best way to deal with this is to put a burden of production on the government to identify a legitimate penological purpose, which burden, however, may be met in circumstances where the situation is a recurrent one and cases exist identifying legitimate penological purposes, or which burden may be met by an articulation of what those purposes are in terms of the answer, or which might need to be met in particular circumstances by the affirmative presentation of evidence. At which the burden of production immediately shifts back to the plaintiff. The burden of... Production and persuasion. Production and persuasion shifts. It would be something like McDonnell Douglas, in a way, or something along those lines, or something like flipping how our LUPA is supposed to work in the perfect set of circumstances. The inmate has to prove a substantial burden, and then the rest of it shifts to the state at that point. So is it fair to say that the way you envision this working is... And maybe you and Mr. Sharp aren't really all that far apart at all on this, that a plaintiff has to come forward and say, this is what I'm asking for in the way of a religious accommodation. I have this belief. I don't feel I'm able to worship with this group or in the way that the prison is giving me resources to worship. Allow me to do something different. Give me some resources to do something different. And once they say that, then the state, the Commonwealth, has to say, look, we can't help you out because of X, Y, Z. They've got to state their penological interest and say why that penological interest requires them to... Or is such that they deny the request. And at that point, then it's back on the plaintiff to say, well, those aren't valid for the following reasons. Have I restated what you were saying correctly? That's very well put, Your Honor. That's how indeed I would attempt to square the circle in this particular sense. And it does sort of partake a little bit of a Title VII sort of analysis in that respect, right? Yes, Your Honor. That's precisely how it works. The only point I would like to emphasize is we did introduce evidence in this case. We did introduce evidence, perhaps haphazardly, but Father Monach testified it's our policy not to have a proliferation of religious congregations. Sure, but we don't know how that played into the court's analysis because the magistrate judge said, I'm just not going there, right? Well, except if you look at page 12, she says on her findings and conclusions, I suggest that if you read that specifically, may I? Yes. Thank you. She says on page 12 of her findings, something that I said to my mind in my brief is something like, assuming I'm wrong in arguendo and that the burden was on the Department of Corrections, nothing Mr. Sharp has done in this case has convinced me that he has proven his case. That's to the extent he presented any evidence to rebut the rationality of the denial. Which paragraph are you looking at? I'm looking at the last paragraph on page 12. No, no. What's the paragraph number? Oh, no. It's on the conclusions of law, Your Honor. It is on, in fact, star page 12 of the opinion, immediately preceding star page 13. Give us the paragraph number and the conclusions. There aren't any. She didn't give us any. They are in the document. There's a one and then there's a two, and it's somewhere in two. Somewhere in two. Okay. It's, to the extent that he presented any evidence to rebut the rationality of the denial, the evidence was not found to be credible or persuasive. Accordingly, judgment on plaintiff's First Amendment claims is properly entered in favor of SCI Green defendants. Then star 13, alternatively, in order to make out a claim. We're all working off the appendix up here. I see. 27. JA 27. JA 27. Yes, and I've cited it in terms of the appendix in my brief, and I apologize. If my colleagues will indulge me, Can I ask you to turn to two other topics for a few minutes? First, the magistrate judge talks about qualified immunity here as an alternative basis for her decision. But she doesn't give an individual analysis of the defendants. She just says, you know, I think they're all okay. It's almost that cursory. Is that an analysis that can really withstand appellate review? It's certainly not the proper way to do the analysis. The analysis should be done on the individual basis. That's correct. But there are cases that have found qualified immunity under any conceivable way of looking at the facts in connection with any of the individuals involved in this particular case. It wouldn't require us to be doing it in the first instance, right, because the district court didn't, right? I mean, the district court just said, yeah, you're all okay. That's correct. But recall as well, like personal involvement, qualified immunity is an alternative argument that you don't reach unless you find, in fact, a violation of his First Amendment rights or a violation of his ARLUPA rights, which I think Sussman does speak very strongly to this situation. Hold on a second. Just before we get off of that, is it possible to say on the qualified immunity issue that there's no clearly established right to group worship, or has that already been established? There is no. That is what she said, and that is what I think your cases say, that it's not clear. There's a right to group worship as long as there's a substantial number of inmates. What is a substantial number? Whether the record in this case where she disagreed and found this fact that although I'll grant you, Sharp testified that there were as many as 50 inmates who were hibachis in SCI Pittsburgh. Imam Ibrahim testified about something that he got, which was some documents, no copies of which were preserved or ever else emerged, and which were not subsequently referenced in Sharp's grievances where you would have thought he would have referenced them if, in fact, they were made. And based on all those considerations, she decided... No information of Greene or Dallas? Dallas is not in the case, and Greene, as far as I know, he's the lone hibachi in Greene. That may or may not be true, but we don't know any more about it. So what we have is what is a substantial number, and as far as our loop was concerned, the little jurisprudence we have seems to say that denying somebody a separate congregation can never be a substantial burden on his right to practice. That's indeed how Judge Van Aske's opinion took it, which was affirmed in a non-presidential opinion by this bench. And in that case, because it doesn't force you to give up your religion in return for government benefit, and it doesn't force you to abjure your religious beliefs, it just doesn't allow you to practice. But numbers matter, right? Pardon me? Numbers matter. That's something you've conceded here in your discussion with us. Of course, numbers matter, but we don't know how many. Right. But that's significant because in your briefing, you talk about under Scott v. Horn, as a matter of law, his interests have been accommodated, but that really can't be the case because numbers do matter and we really don't know what the numbers are here. Right? But I think it was his burden, Your Honor, I would suggest at that point to show that he had, that there were a substantial number of inmates, whatever substantial means. And I think that connects back to Judge Sirica's point that because that's such a murky area, we can't say we have a clearly established right. That may be. My only question at this juncture was, whatever that number is, it can't be the case that a previous precedent like Scott v. Horn resolves the issue because it's a fact-specific question, how many people have you got and whether that needs to be accommodated, right? Correct, although you can triangulate it with Smith v. Kyler that involves 15 Rastafarians. Now, if we are ready to turn to Sossaman for a minute, what's your response to Mr. Bailey's assertion that the implication of Sossaman has to be there is a private right for damages under ALUPA because otherwise there is no way to police how federal funds are being used by the states in correctional institutions? My learned friend and I could not be more opposed on this point, with all due respect. I think what Sossaman says to me is this. It says that the term appropriate relief from the standpoint of spending clause legislation, which is what Sossaman is, is an ambiguous term insofar as any form of monetary relief is concerned. That's why it found that the 11th Amendment was not waived by the states by accepting federal funds with respect to ALUPA in terms of state agencies and entities, the state itself, and individuals sued in their official capacity. A fortiori, I submit to you, that if in fact appropriate relief is in a case like that, too ambiguous to find monetary relief was necessarily clearly and unambiguously expressed, which is a requirement of spending clause legislation, as regards states, which are in fact the contracting parties, in dealing with the federal funds to which ALUPA would relate, then obviously line corrections officers, chaplains, and prison officials, in those particular circumstances, it cannot be understood to specifically impart monetary liability on them. Why not? We have circumstances under other laws where we say there's sovereign immunity, you can't go after the state there, but you can sue people in their individual capacity for damages. What is it? Well, those are 14th Amendment Section 5 cases, and that allows them to be sued as individuals, and there's a long line of jurisprudence back to the United States Supreme Court that in fact allows a level of liability for individuals acting under color of state law back to the 1871 Enforcement Acts, Anti-Ku Klux Klan Acts. So the fact is that when we had RFRA, it was presumed to be an enactment under Section 5 of the 14th Amendment, but the City of Bern v. Flores gutted that, so we're back to spending clause, and if you put, I suggest, as some courts have said, if you would put individual liability on individuals who worked for state agencies in states that were recipients of federal funds, as Justice Thomas suggested in a footnote in Petter v. Williamson, the enactment would be unconstitutional under the spending clause, because the spending clause works differently than the 14th Amendment. It is not an enactment under, works differently than Section 1983, which is an enactment under the 14th Amendment. It is not designed to punish individuals who abuse people's constitutional rights under color of state law. It's a law that's designed to compel individuals who have taken federal funds, or states that have taken federal funds to meet with the conditions that it imposes on them for taking those federal funds, and a contract law analysis is what the United States Supreme Court says you should put on this type of legislation, and it's quite obvious that Father Terza and Deputy Krasevic did not enter into a contract with the United States of America for .446% of their salary, and that would be, in fact, a way of abusing our federal system and the state and federal points. We're a government of enumerated powers, and the 14th Amendment doesn't work. I got it. Thank you very much. We appreciate your argument. We have Mr. Bailey back on rebuttal. Thank you for your time and your patience. Good. Thank you. Just a few quick points, Your Honors. Your Honor mentioned Title VII, and I think that's exactly right. I mean, I think burden-shifting is certainly nothing novel, and with regard to Turner in specific, courts have been applying the standard for 25 years without any trouble. The district court did so in this case in 2004, so, you know, as far as what the opinion should look like, Your Honor, I think it's been written several times and very clear, and I think the analogy to Title VII and burden-shifting is precisely on point. I would like to mention in the Wolf decision, this court set forth exactly what the burdens or the obligations of the trial court are when conducting this analysis, and central among those, with regards to the first prong of the Turner analysis, the courts must describe the interest that's purportedly being served. They must determine whether the interest was neutral and legitimate and examine its purported rationality. That is the analysis that the district court must conduct, and where we are deprived of that analysis, there's really no record or no basis for this court to then come around behind it and conduct that analysis in the first instance. So that's what we're lacking here. That's one of the problems with what the trial court did. With regard to what the government's actual burden is, I think it's interesting to note the Beard v. Banks decision where it was the plurality decision, but I believe it's a binding opinion, in which it said that the state must prove more than a formalistic logical connection between some random penological interest in the conduct that's being challenged. I don't think that we can do this by looking at prior case law, and I believe Your Honor was exactly right. The mere fact that costs may have been a legitimate reason to deny an accommodation request in some other case does not mean that in perpetuity defendants will always meet their burden by saying the word cost. It's quite misleading, and the analysis has to be conducted on a case-by-case basis. There was a question that came up about the form that was being used at SCI Pittsburgh. Your Honor mentioned that Father Terzis said he didn't use the form. I wanted to just also note that the form that's in the record specifically cognizes that there will be group requests. But we have a finding of fact, as your opponent pointed out. Mr. Reichle says, hey, magistrate judge found, as a matter of fact, there wasn't a written request for accommodation at SCI Pittsburgh. Is that clearly erroneous? Are you pressing a clearly erroneous conclusion on us? Well, I think that I am, and I think the district court erred in two respects. I mean, for one, the court never addressed why this form specifically anticipates that there will be group requests. But Mr. Bailey, didn't the magistrate judge in making that finding say, Mr. Sharp, you're here prepared with all sorts of documents, you've kept everything, but you don't happen to have this one. And that was the basis for her factual determination. That's a pretty sound basis for a factual determination. I think the district court looked at a lot of circumstantial evidence and did not address the direct evidence on two points. One is whether or not group requests were prohibited. And in that respect, we've got the form itself, which says that group requests are okay. Secondly, the finding that he never submitted an individual request contradicts all of the testimony from the individuals that were there who all specified, and we've laid this out in the brief, with the actual testimony, but that he did, in fact, come forward with other inmates and submit individual requests. Now, he did not have the papers. That's certainly correct. But I paused when I saw that the district court had ignored what seemed to be unanimous testimony on this point to find a contrary fact. I wanted to speak... We'll give you one more minute. Thank you, Your Honor. Clearly established, I think there are two points to keep in mind here. One is the communal worship, whether or not that's a clearly established right. But that's not the only right at issue. The other is whether or not prison administrators and the government at large can be making these sort of ecclesiastical determinations based on what the tenets of a particular faith require. And as we've said out in the brief, that's really what's going on here is they're saying, no, your religion really doesn't require you to do that, and therefore we can deny the request. It's an uncomfortable position, but at some point don't prison authorities have to make a judgment along those lines by saying, you know, hey, Methodist, Protestant, close enough, you guys can do this together. Catholic, Protestant, more different. You don't. I mean, the analog of that in the Islam world. I mean, isn't that something that they have to do in figuring out how to deploy prison resources? I think they do have to do it, and I think they have to then be able to justify it. And that's what we're lacking in this case. They never did that. With regards to the qualified immunity issue, I believe that burden is on the defendants as an affirmative defense. I see I'm out of time. I appreciate the opportunity to appear. Good. The case was well argued. We thank counsel very much. Take the matter under advisement.